John L. Amsden, Esq.
Sydney E. Best, Esq.
BECK AMSDEN & STALPES, PLLC
2000 South 3rd Avenue, Suite A
Bozeman, MT 59715
Tel:   (406) 586-8700
Fax:   (406) 586-8960
amsden@becklawyers.com
sydney@baslawyers.com

Patrick W. Pendley, Esq. (LSBA #10421)
PENDLEY, BAUDIN & COFFIN, L.L.P.
24110 Eden Street
Post Office Drawer 71
Plaquemine, Louisiana 70765-0071
Tel:   (225) 687-6396
Fax:   (225) 687-6398
pwpendley@pbclawfirm.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KITTY BELLE RIGGS, as Personal Representative for the Estate of ROBERT PITTMAN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; AND PHILIPS RS NORTH AMERICA LLC,<br><br>Defendants. | Case No. 2:22-cv-00450-JFC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff Kitty Belle Riggs, as Personal Representative for the Estate of Robert Pittman, on behalf of herself and the putative class of all others individuals similarly situated as defined below, alleges as follows:

## **INTRODUCTION**

1.    Defendants Koninklijke Philips N.V., Philips North America, and Philips RS North America LLC (collectively, "Philips" or "Defendants") manufacture and sell a variety of products intended to help people breathe. Among these breathing devices are Continuous Positive Airway Pressure machines ("CPAP") and Bilevel Positive Airway Pressure machines ("BiPAP"), which are used to treat sleep apnea. Mechanical ventilators, meanwhile, treat respiratory failure. Each device—CPAP, BiPAP, and ventilators (collectively, the "breathing devices")—generally works by pumping air into the patient's airway. Without these devices, patients could risk, *inter alia*, heart attack, stroke, and death.

2.    On June 14, 2021, Philips issued a recall of many of its CPAPs, BiPAPs, and ventilators (the "Recalled Devices").[1] The "Urgent[] Medical Device Recall" explained that the sound abatement foam in the Recalled Devices, which contains polyester-based polyurethane ("PE-PUR"), is "susceptible to degradation

---

[1] Recalled Devices include, but are not limited to, the following models: E30; Dream Station ASV; DreamStation ST, AVAPS; SystemOne ASV4; C-Series ASV; C-Series S/T and AVAPS; OmniLab Advanced Plus; SystemOne (Q-Series); DreamStation CPAP, Auto CPAP, BiPAP; Dream Station Go CPAP, APAP; Dorma 400 CPAP; Dorma 500 CPAP; REMStar SE Auto CPAP; Trilogy 100; Trilogy 200; Garbin Plus, Aeris, LifeVent; A-Series BiPAP V30 Auto; A-Series BiPAP A40; A-Series BiPAP A30.

and volatile organic compound emission." Specifically, Philips admitted to consumers that the PE-PUR foam might break down and be inhaled or ingested. Further, Philips admitted that the PE-PUR foam might "off-gas" certain chemicals which can be inhaled or ingested. The "off-gassing" of chemicals from the PE-PUR foam, Philips disclosed, can adversely affect a patient's internal organs. Moreover, the chemicals off-gassed from the PE-PUR foam are carcinogenic.

3.      Philips knew or should have known about the risks associated with the PE-PUR foam long before it issued the recall in June 2021. Prior to the recall, Philips received complaints about the presence of black debris and particles in the Recalled Devices' air pathway. Philips also received reports of patients suffering from headaches, upper airway irritation, cough, chest pressure, and sinus infections. Nevertheless, Philips delayed warning the public and vulnerable patients about the danger the Recalled Devices pose.

4.      Most patients must use the Recalled Devices every day, but Philips has no plan or concrete timeline for replacing or repairing any of the Recalled Devices.

5.      In the meantime, patients are left to wrestle with impossible choices. If a patient continues to use their Recalled Device, they mitigate against sleep apnea symptoms, but risk further effects of PE-PUR degradation and carcinogenic off-gassing. If they stop using their Recalled Device while they wait for Philips to

fulfill its nebulous promise to provide a replacement, they avoid PE-PUR

degradation and carcinogenic off-gassing, but risk sleep apnea symptoms, *i.e.,*

heart attack, stroke, and death. Or, they attempt—if they can afford it—to purchase

a non-Philips replacement at considerable expense.

6.      On information and belief, Philips timed its recall notice to coincide

with the launch of its next generation of products, which apparently do not suffer

from the same PE-PUR issues. Thus, whenever Philips fulfills its promise to

replace the Recalled Devices, it will enjoy further profits when patients pay for the

replacements.

7.      Plaintiff brings this action on behalf of himself and a putative class of

similarly situated persons defined below, who purchased the defective Recalled

Devices. Plaintiff seeks to obtain relief for the injuries caused by Philips' conduct

and its defective breathing devices.

## **PARTIES, JURISDICTION AND VENUE**

8.      Plaintiff hereby incorporates all other paragraphs of this Complaint as

though fully set forth herein.

9.      Plaintiff Kitty Belle Riggs, Personal Representative for the Estate of

Robert Pittman, is a citizen of Montana, residing at all times relevant hereto in

Broadus, Powder River County, Montana.

10.     Robert "Bob" Pittman was a citizen of Arizona, residing at all times relevant hereto in Tempe, Maricopa County. In 2015, Bob began working in Montana, for at least a month at a time, on an annual basis. Bob used a Philips CPAP device on a nightly basis since 2012, including during his long-term stays in Montana. Specifically, Bob used his CPAP device in Bozeman, Montana and Broadus, Montana. His most recent device, a DreamStation, is among the Recalled Devices.

11.     Defendant Koninklijke Philips N.V. is a Dutch multinational company organized under the laws of the Netherlands, with its principal place of business located in Amsterdam, Netherlands. It is the parent company of Philips North America LLC and Philips RS North America LLC.

12.     Defendant Philips North America LLC is a Delaware company with its principal place of business in Cambridge, Massachusetts.

13.     Defendant Philips RS North America LLC, formerly Respironics, Inc., is a Delaware company headquartered in Pittsburgh, Pennsylvania.

14.     As stated at the outset, reference to "Philips," "Defendant," or "Defendants" refers to each and every Defendant individually and collectively.

15.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the matter in controversy exceeds $5

million, exclusive of interest and costs, and is a class action in which Plaintiff and some members of the Class are citizens of states different than Defendants.

16.     This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form the same case or controversy as the claims within the Court's original jurisdiction.

17.     Venue is proper in the U.S. District Court for the District of Montana, pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a), because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and because the Defendants caused harm to class members residing in this District.

18.     This Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in the District of Montana, and the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with this District. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of the Recalled Devices and/or committed overt acts in furtherance of the unlawful acts alleged in this complaint in this District. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District.

19.     On October 8, 2021, a Panel on Multidistrict Litigation transferred all actions like this one to the Western District of Pennsylvania and assigned Honorable Judge Joy Flowers Conti for coordinated or consolidated pretrial proceedings, cause number MDL 3014.

## ALLEGATIONS COMMON TO ALL COUNTS

20.     Plaintiff hereby incorporates all other paragraphs of this Complaint as though fully set forth herein.

## I.    Sleep Apnea and Breathing Device Therapies

21.     Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's life, including negatively impacting energy, mental performance, and long-term health.

22.     CPAP therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to a patient's throat to help them breathe.

23.     Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or face mask device to maintain air pressure in a patient's airway. BiPAP therapy is distinguishable from CPAP therapy, because the BiPAP device delivers two alternating levels of pressurized air —inspiratory and expiratory—into a patient's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a patient as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow the patient to comfortably breathe out.

24.     Patients who use CPAP or BiPAP devices typically use them every day when they sleep. Symptoms of sleep apnea may return quickly if therapy is discontinued.

25.     Respiratory failure is a condition in which a patient has difficulty breathing or getting enough oxygen into the blood. Many conditions can cause respiratory failure, and it can be fatal if untreated.

26.     Mechanical ventilation is a treatment to help a patient breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator

pushes airflow into the patient's lungs like a bellows to help them breathe. The COVID-19 pandemic has led to a significant increase in global demand for ventilators.

**II.    Philips Recalls Breathing Devices in June 2021**

27.    Philips manufactures and sells CPAP machines, BiPAP machines, and ventilators, among other products. Philips' breathing devices cost several hundred, if not thousands of dollars.

28.    Philips' flagship CPAP/BiPAP machine product family is known as the "DreamStation" family line, which includes the original DreamStation, launched in October 2015.

29.    Many of Philips' CPAP and BiPAP machines and ventilators contain PE-PUR foam for sound abatement. Owing to the design of the machines, pressurized air passes through the PE-PUR foam before it is pumped into the patient's airway.

30.    On April 13, 2021, Philips announced it was launching the DreamStation 2, the next generation machine in its DreamStation product family.

31.    Less than two weeks later, on April 26, 2021, Philips publicly disclosed for the first time that the PE-PUR foam in its breathing devices might degrade. Philips made this disclosure in its Quarterly Report for Q1 2021, under a

section entitled, "Regulatory Update." In the same disclosure, Philips insinuated that patients could safely purchase devices from its DreamStation 2 product family.

32.     Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and BiPAP devices, as well as a variety of its mechanical ventilators to address health risks posed by the PE-PUR foam. As already noted, Philips determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals." In total, Philips announced that "[b]etween 3 million and 4 million" devices would be targeted in the recall.

33.     According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."

34.     Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."

35.     Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or

cause permanent impairment, or require medical intervention to preclude permanent impairment."

36.    Philips also disclosed that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."

37.    At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR foam may off-gas or degrade.

38.    Philips has never disclosed when it first discovered or received reports from users of Recalled Devices about the presence of black debris or particles within the machines' airpath circuits.

39.    At minimum, Philips knew of degradation of the PE-PUR foam in April 2021, but waited seven weeks to issue a recall notice. During that time, Philips unreasonably put patients using the Recalled Devices at risk of developing serious adverse health effects, including organ failure and cancer.

40.    As a result of the health risks associated with the Recalled Devices, together with Philips' concealment of these risks from the date they were first reported to Philips through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at minimum, have been substantially reduced in value.

41.    As noted already, patients who purchased the Recalled Devices must either stop use to mitigate against further toxic exposure, or continue to use their Recalled Device to prevent severe sleep apnea symptoms while Philips delays replacing the Recalled Device. Philips has placed the onus on patients and their doctors to balance the danger Philips created.

### III.    Robert Pittman ("Bob")

42.    Bob was diagnosed with sleep apnea in or about 2011. On the prescription of his doctor, Bob purchased a Philips REMstar Pro CPAP machine. In about 2018, Bob purchased a replacement Philips CPAP machine: this time, Bob bought a Philips DreamStation.

43.    Prior to receiving Philips' recall notice in June 2021, Bob used his CPAP device every night, for eight hours per night.

44.    When Bob began working in Montana on an annual basis in 2015, Bob brought his CPAP device with him and used it nightly there, too. Specifically, Bob used his CPAP device in Bozeman, Montana and Broadus, Montana.

45.    Bob was diagnosed with throat and lymph cancer in February 2021. Bob has no family history of either type of cancer. Bob has never smoked, he is not overweight, and he has never contracted COVID-19.

46.    Bob received Philips' recall notice in the summer of 2021, while he was undergoing radiation for his cancer. Bob's current CPAP device, the DreamStation, was among the Recalled Devices.

47.    Bob would not have purchased the DreamStation if he had known that it was defective, contained carcinogenic byproduct, and would be subject to a recall for containing defective materials.

48.    The manuals accompanying Bob's DreamStation did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Philips informed Bob of these risks, he would not have purchased or used DreamStation.

49.    Without knowing the risks associated with his Recalled Device, Bob used it continuously for eight hours per night, every night, for at least three years.

50.    Because of the warnings contained in Philips' recall notice, Bob tried to use his Recalled Device less. However, Bob's sleep apnea symptoms made it impossible for him to completely stop use, and Philips never provided a replacement. Bob could not afford to purchase a replacement from Philips' competitors. In addition to symptoms caused by undertreating his sleep apnea, Bob also experienced anxiety and worry about the harm his Recalled Device has caused

and will continue cause to his health. Further, the radiation treatment caused Bob's throat to become raw, making use of his Recalled Device painful.

51.    In February 2022, Bob entered hospice care, seeking palliative relief from his cancer symptoms.

52.    On March 2, 2022, Bob died.

53.    On June 6, 2022, District Court Judge Michael B. Hayworth for Montana's Sixteenth Judicial District Court, Powder River County, appointed Bob's sister, Kitty Belle Riggs, as Personal Representative for the Estate of Robert Pittman.

54.    On August 22, 2022, Kitty Belle Riggs, properly and timely moved for substitution as Plaintiff in this lawsuit.

55.    Philips has admitted that the Recalled Devices, like Bob's DreamStation, are dangerous. This danger rendered the Recalled Devices effectively worthless to Bob, especially in view of the fact that Bob's Recalled Device killed him.

56.    Plaintiff suffered economic and non-economic injuries as a result of Bob's purchase and use of the Recalled Device, and she entitled to damages.

## TOLLING AND ESTOPPEL

### I.    Discovery Rule Tolling

57.    Plaintiff and the putative class members had no way of knowing about Philips' conduct with respect to the health risks associated with the Recalled Devices.

58.    Neither Plaintiff nor any putative class members, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiff and putative class members did not discover and did not know of facts that would have caused a reasonable person to suspect Philips was engaged in the conduct alleged herein.

59.    For these reasons, all applicable statutes of limitations have been tolled by the discovery rule with respect to claims asserted by Plaintiff and the putative class.

### II.    Fraudulent Concealment Tolling

60.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiff and the putative class.

61.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiff and the putative class. Plaintiff and the members of

the putative class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Philips' conduct.

62.    For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiff or the putative class should be tolled.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff seeks certification on behalf of a putative class defined as follows (the "Class"):

> **MONTANA CLASS**: All persons residing in Montana who purchased a Recalled Device for personal use.

64.    Plaintiff reserves the right to modify or refine the definitions of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

65.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; and (b) Philips and Philips' employees, officers, and directors.

66.    This action has been brought and may be properly maintained as a class action for the following reasons:

67.    <u>Numerosity:</u> Members of the Class are so numerous that their individual joinder is impracticable. The proposed Montana Class contains at least hundreds of individuals who purchased a Recalled Device. The Class is therefore

sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiff at this time, but the Class members are readily ascertainable and can be identified by Defendants' records.

68.    Commonality: Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including, but not limited to, the following:

- Whether Defendants were unjustly enriched by the sale of the Recalled Devices;

- Whether Defendants were negligent in implementing the recall;

- Whether Defendants failed to warn consumers regarding the risks of the Recalled Devices;

- Whether the Recalled Devices are defective by way of design;

- Whether Defendant breached express warranties;

- Whether Defendants' practices constitute unfair or deceptive acts or practices under Montana's consumer protection laws;

- The appropriate nature of class-wide equitable relief;

- Whether Plaintiff and the members of the Class are entitled to compensatory, statutory, and punitive damages.

69.    Typicality: Plaintiff's claims are typical of the claims of all members of the Class who purchased Recalled Devices for personal use.

70.    <u>Adequacy:</u> Plaintiff is an adequate member of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he has retained counsel competent and experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

71.    <u>Superiority:</u> This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interest of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

72.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

## COUNT 1: STRICT PRODUCT LIABILITY

73.     Plaintiff hereby incorporates all other paragraphs of this Complaint as though fully set forth herein.

74.     At all times relevant, Philips designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Recalled Devices.

75.     The Recalled Devices were expected to and did reach consumers and users without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Philips.

76.     Philips sold Recalled Devices to consumers, like Bob and Class members, in a defective condition unreasonably dangerous to the user by using sound abatement foam that degrades and off-gases toxic and carcinogenic chemicals. Ordinary consumers would not anticipate the dangers posed by the sound abatement foam in the Recalled Devices, including that they would be exposed to toxic and carcinogenic materials.

77.     The Recalled Devices are defective by way of design. Philips should have used an alternative, non-toxic material to suppress sound. Indeed, alternative designs on the market do not use toxic PE-PUR foam.

78.    The Recalled Devices are also defective by way of failure to warn. Philips never warned consumers, like Bob and Class members, of the risks associated with the PE-PUR foam.

79.    Philips is liable for the harms its defective products caused to Bob and the Class, including cancers, headaches, irritation, inflammation, respiratory issues, long-term exposure to materials with toxic and carcinogenic effects, and mental distress.

80.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT II: NEGLIGENT RECALL

81.    Plaintiff hereby incorporates all other paragraphs of this Complaint as though fully set forth herein.

82.    By issuing a voluntary recall in June 2021, Philips assumed a duty to Bob and the Class members to exercise reasonable care in issuing and implementing the recall.

83.    Philips breached its duty by failing to promptly repair or replace the Recalled Devices.

84.    Philips knew or should have known that its recall would leave patients, like Bob and the Class, with a series of impossible and dangerous choices: (1) continue using their Recalled Device to mitigate against the symptoms of sleep

apnea, which could be fatal, but risk further exposure to the Recalled Device's toxic and carcinogenic materials; (2) stop using their Recalled Device to prevent further exposure to toxic and carcinogenic materials, but risk the severe symptoms of sleep apnea; or (3) attempt to purchase a competitor's breathing device at considerable expense—an impossibility for many patients.

85.     Philips made no efforts to timely implement its recall. Indeed, Philips has yet to give many patients, like Bob and the Class, a date on which it will replace their defective devices.

86.     Philips' breach caused Plaintiff and the Class damages, including pain and suffering, emotional distress, in an amount to be determined at trial.

## COUNT III: BREACH OF EXPRESS WARRANTY

87.     Plaintiff hereby incorporates all other paragraphs of this Complaint as though fully set forth herein.

88.     Philips marketed and sold the Recalled Devices into the stream of commerce with the intent that the Recalled Devices would be purchased by Plaintiff and the Class.

89.     Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These

express warranties became part of the basis of the bargain that Bob and the Class entered in to upon purchasing the Recalled Devices.

90.    Philips Defendants warranted the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

91.    Moreover, Philips expressly warranted, advertised, and represented to Plaintiff and the Class that the Recalled Devices were safe and appropriate for human use.

92.    Plaintiff and the Class relied on Philips' express warranties when they decided to purchase the Recalled Devices.

93.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

94.    Philips therefore breached its express warranties by placing Recalled Devices into the stream of commerce and selling them to consumers. The Recalled Devices pose health risks, rendering them unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

95.    Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiff and members of the Class that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR foam used in the Recalled Devices.

96.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

97.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiff and members of the Class. The dangers associated with use of the Recalled Devices were undiscoverable by Plaintiff and members of the Class at the time of purchase of the Recalled Devices.

98.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

99.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions

to induce Plaintiff and members of the Class to rely on such representations and omissions.

100.   Affording Philips an opportunity to cure its breaches of written warranties would be unnecessary and futile here. Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR foam or to replace the PE-PUR foam in the Recalled Devices to make them safe and healthy for use by Plaintiff and members of the Class but failed to do so until now.

101.   As a direct and proximate result of Philips' breaches of express warranty, Plaintiff and members of the Class have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiff and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

102.   Plaintiff and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## <u>COUNT IV: BREACH OF IMPLIED WARRANTY OF<br>MERCHANTABILITY</u>

103.   Plaintiff hereby incorporates all other paragraphs of this Complaint as though fully set forth herein.

104.   Philips are merchants engaging in the sale of goods to Plaintiff and the Class.

105.   There was a sale of goods from Philips to Plaintiff and the Class. At all times mentioned herein, Philips manufactured or supplied the Recalled Devices, and prior to the time the Recalled Devices were purchased by Plaintiff and the Class, Philips impliedly warranted to them that the Recalled Devices were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact and omissions made on the Recalled Devices' labels and packaging, including that the Recalled Devices were safe and appropriate for human use. Plaintiff and the Class relied on Philips' promises and affirmations of fact and omissions when they purchased and used the Recalled Devices.

106.   Contrary to these representations and warranties, the Recalled Devices were not fit for their ordinary use and did not conform to Philips' affirmations of fact and promises and omissions because use of the Recalled Devices is accompanied by the risk of adverse health effects, which does not conform to the labels and packaging of these devices.

107.    Philips breached its implied warranties by selling Recalled Devices that failed to conform to the promises or affirmations of fact made on the packaging or label, as use of each Recalled Devices was accompanied by the risk of developing adverse health effects that do not conform to the packaging or label.

108.    Philips was on notice of this breach, as it was made aware of the adverse health effects accompanying use of the Recalled Devices through user reports submitted to Philips and through lab testing.

109.    Privity exists because Philips impliedly warranted to Plaintiff and the Class through the warranting, packaging, advertising, marketing, and labeling that the Recalled Devices were natural, and suitable for use to treat health conditions, and made no mention of the attendant health risks associated with use of the Recalled Devices.

110.    Philips' breach caused Plaintiff and the Class to suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

111.    Plaintiff and the Class are entitled to damages for Philips' failure to deliver goods conforming to their implied warranties.

## COUNT V: FRAUDULENT MISREPRESENTATION

112.   Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

113.   Philips failed to advise Plaintiff and the Class that the Recalled Devices posed serious health risks to their users and Philips falsely represented to Plaintiff and the Class that the Recalled Devices were safe for human use.

114.   Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class to purchase the Recalled Devices.

115.   Philips knew that its representations and omissions about the Recalled Devices were false in that the Recalled Devices contained PE-PUR foam and thus were at risk of causing adverse health effects to users of the Recalled Devices. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

116.   Plaintiff and the Class did in fact rely on these omissions and misrepresentations and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and otherwise promoted the Recalled Devices, Plaintiff's and the Class' reliance on Philips' omissions and misrepresentations was justifiable.

117.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices: (1) that were worth less than the price they paid; (2) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices; and (3) which did not conform to the Recalled Devices' labels, packaging, advertising, and statements.

118.    Plaintiff and the Class are entitled to damages for injuries suffered as a result of Philips' fraudulent misrepresentations.

## COUNT VI: FRAUD BY OMISSION

119.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

120.    Philips concealed from and failed to disclose to Plaintiff and the Class that use of the Recalled Devices is accompanied by a risk of adverse health effects, which does not conform to the products' labels, packaging, advertising, and statements.

121.    Philips was under a duty to disclose to Plaintiff and the Class the true quality, characteristics, ingredients and suitability of the Recalled Devices because: (1) Philips was in a superior position to know the true state of facts about its products; (2) Philips was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Recalled Devices for use by

individuals; and (3) Philips knew that Plaintiff and the Class could not reasonably have been expected to learn or discover prior to purchasing the Recalled Devices that there were misrepresentations and omissions by Philips in the packaging, labels, advertising, and websites regarding the health risks associated with use of these devices.

122.   The facts concealed or not disclosed by Philips to Plaintiff and the Class were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Recalled Devices.

123.   Plaintiff and the Class justifiably relied on Philips' omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of the Recalled Devices, which is inferior when compared to how the Recalled Devices are advertised and represented by Philips.

124.   As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered damages in that they purchased the Recalled Devices: (1) that were worth less than the price they paid; (2) which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices; and (3) which do not conform to the Recalled Devices' labels, packaging, advertising, and statements.

125.   Plaintiff and the Class are entitled to recover damages for harms caused by Philips' fraudulent omissions.

## COUNT VII: NEGLIGENT MISREPRESENTATION

126.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

127.    Philips had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of the Recalled Devices.

128.    Philips breached its duty to Plaintiff and the Class by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Philips and by failing to promptly remove the Recalled Devices from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Recalled Devices.

129.    Philips knew or should have known that the qualities and characteristics of the Recalled Devices were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Philips. Specifically, Philips knew or should have known that: (1) the use of the Recalled Devices was accompanied by risk of adverse health effects that do not conform to the packaging and labeling; (2) the Recalled Devices were adulterated, or at risk of being adulterated, by the PE-PUR foam; and (3) the Recalled Devices were otherwise not as warranted and represented by Philips.

30

130.    As a direct and proximate result of Philips' conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Recalled Devices: (1) that were worth less than the price they paid; (2) which they would not have purchased at all had they known they contained PE-PUR Foam that could cause users of the Recalled Devices to suffer adverse health effects; and (3) which do not conform to the products' labels, packaging, advertising, and statements.

131.    Plaintiff and the Class are entitled to recover damages for injuries caused by Philips' negligent misrepresentation.

## COUNT VIII: UNJUST ENRICHMENT

132.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

133.    Plaintiff and the Class conferred substantial benefits on Philips through their purchase of the Recalled Devices. Philips knowingly and willingly accepted and enjoyed these benefits.

134.    Philips knew or should have known that the payments rendered by Plaintiff and the Class were given with the expectation that the Recalled Devices would have the qualities, characteristics, and suitability for use represented and warranted by Philips. As such, it would be inequitable for Philips to retain the benefit of the payments under these circumstances.

135.   Philips' acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Philips to retain the benefits without payment of the value to Plaintiff and the Class.

136.   Plaintiff and the Class are entitled to recover from Philips all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## COUNT IX: MEDICAL MONITORING

137.   Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

138.   At all relevant times, the Defendants designed, manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and placed the Recalled Devices into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

139.   Defendants have reported that users of the Recalled Devices face risks of serious injury from the degradation of PE-PUR foam contained in the Recalled Devices. Degradation of PE-PUR foam may be caused by exposure to chemical emissions from the foam material, high heat and high humidity environments in certain regions, and cleaning methods such as ozone may accelerate potential degradation.

140.   When PE-PUR foam degrades into particles that may enter the device's pathway and be ingested or inhaled by users of the devices, users face significantly increased risks of serious injury that can be life-threatening, cause permanent impairment, and require medical intervention to preclude permanent impairment. The potential risks of degraded foam exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects.

141.   The off-gassing of chemicals from the PE-PUR Foam contained in the Recalled Devices poses risks of serious injury that can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. The potential risks of exposure to off-gassing from PE-PUR Foam include headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

142.   The absence of visible particles does not mean that PE-PUR Foam breakdown has not already begun. Philips has reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including powerful irritants, and other chemicals that can cause organ degeneration and failure through repeated exposure.

143.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have been exposed to substantially increased risks of serious injury from off-gassing and degradation of PE-PUR Foam in the Recalled Devices, which is beyond normal levels of risk.

144.    Indeed, Plaintiff currently in remission from throat and lymph cancer likely caused by his daily use of a Recalled Device over the course of years.

145.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have a significantly increased risk of suffering serious injury or contracting a serious latent disease, and suffering further injury at an unknown date in the future. Such injuries include cancer and organ failure, among others currently unknown or just being discovered.

146.    Monitoring procedures exist that makes the early detection of damage from degraded and/or off-gassed PE-PUR foam possible. These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

147.    Existing medical research indicates that exposure to the chemicals found in off-gassed or degraded PE-PUR foam, can cause serious, life-threatening and permanent injuries. Philips has received reports from users of the Recalled

Devices of headache, upper airway irritation, cough chest pressure and sinus infection. The exposure to the defects inherent in the Recalled Devices has occurred for users, such as Plaintiff, but the full extent of the injuries will not manifest until later in Plaintiff and the Class members' lives. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff and the Class be placed under period diagnostic testing beyond that normally recommended in the absence of use of the Recalled Devices.

148.   Plaintiff and the Class are entitled to medical monitoring damages to diagnose injuries caused by the Recalled Devices at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems proper.

## COUNT X: VIOLATION OF MONTANA CONSUMER PROTECTION ACT (Mont. Code Ann. §§ 30-14-1 et seq.)

149.   Plaintiff hereby incorporates all Paragraphs of this Complaint as though fully set forth herein.

150.   At all times mentioned herein, Philips engaged in "trade" or "commerce" in Montana as defined by Montana Code Annotated § 30-14-102, in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited,

offered for sale, and sold "services", "property", "articles", "commodities", or "things of value".

151.    Montana's consumer protection law ("MCPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful." Mont. Code Ann. § 30-14-103.

152.    Philips violated and continues to violate the MCPA.

153.    Philips' deceptive and unfair acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead Plaintiff and the Class, including consumers acting reasonably under the circumstances, to their detriment.

154.    On the labels and packaging, on websites, through national advertising campaigns, and elsewhere, Philips repeatedly advertised that the recall devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR foam used in the recall devices, and therefore the recall devices themselves, were unsafe and unfit for human use.

155.    Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the recall devices without being aware that the PE-PUR foam used in the recall devices, and therefore the recall devices themselves were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts

and practices, Plaintiff and the Class suffered damages by purchasing the recall

devices because they would not have purchased the recall devices had they known

the truth, and they received a product that was worthless because it contains PE-

PUR foam which can cause a number of adverse health effects including organ

failure and cancer.

156.    Philips' deceptive trade practices caused ascertainable damages to

Plaintiff and the Class in the form of the loss or diminishment of value of the of the

Recalled Devices, which allowed the Defendant to profit at the expense of the

Plaintiff and the Class.

157.    Plaintiff and the Class seek damages for the injuries caused by

Defendants' unfair and deceptive acts and practices as provided by MCPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1.      An order certifying this action and the Class requested herein as a

class action, designating Plaintiff as the representative of the Class, and appointing

Plaintiff's counsel as counsel for the Class;

2.      An order declaring that Philips' actions constitute: (i) breach of

express warranty; (ii) breach of implied warranty of merchantability; (iii)

fraudulent misrepresentation; (iv) fraud by omission; (v) negligent

misrepresentation; and (vi) unfair and deceptive business practices in violation of

Montana consumer protection statutes, and that Philips is liable to Plaintiff and the Class, as described herein, for damages arising therefrom;

3.      A judgment awarding Plaintiff and members of the Class all appropriate damages in an amount to be determined at trial;

4.      A judgment awarding Plaintiff and the Class medical monitoring damages;

5.      A judgment awarding Plaintiff and the Class prejudgment and post-judgment interest, as permitted by law;

6.      A judgment awarding Plaintiff and the Class costs and fees, including attorneys' fees, as permitted by law; and

7.      Grant such other legal, equitable or further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

1.      Plaintiff demands a trial by jury for all issues so triable.


DATED this 22nd day of August 2022.


/s/ John L. Amsden
BECK AMSDEN & STALPES, PLLC

*/s/ Patrick W. Pendley*
PATRICK W. PENDLEY (LSBA #10421)
*Pendley, Baudin & Coffin, L.L.P.*
24110 Eden Street
Post Office Drawer 71

Plaquemine, Louisiana 70765-0071
Telephone: (225) 687-6396
Facsimile: (225) 687-6398
Email: pwpendley@pbclawfirm.com

*Attorneys for Plaintiffs*